**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **Ronda C.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:17-CV-2114-G-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court is the *Brief for Plaintiff*, filed November 14, 2017 (doc. 16), *Defendant's Brief*, filed December 14, 2017 (doc. 17), and the *Reply Brief for Plaintiff*, filed January 2, 2018 (doc. 18).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further administrative proceedings.

## I.  BACKGROUND[1]

Ronda C. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  (docs. 1; 16.)

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

## A.     <u>Procedural History</u>

On October 23, 2014, Plaintiff filed her application for a period of disability and DIB, alleging disability beginning on April 5, 2013.  (R. at 57.)  Her claim was denied on January 28, 2015, and upon reconsideration on April 7, 2015.  (R. at 57, 68.)  On April 17, 2015, she requested a hearing before an Administrative Law Judge (ALJ).  (R. at 82-83.)  She appeared and testified at a hearing on March 24, 2016.  (R. at 29-46.)  On May 17, 2016, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits.  (R. at 7-21.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on May 25, 2016.  (R. at 132.)  The Appeals Council denied her request for review on June 6, 2017, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-6.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

## B.     <u>Factual History</u>

### 1.     **Age, Education, and Work Experience**

Plaintiff was born on February 13, 1965, and was 51 years old at the time of the hearing. (R. at 32, 57.)  She had at least a high school education and could communicate in English.  (R. at 32.)  She had past relevant work experience as a store department manager and a teacher's aide.  (R. at 17, 33, 44.)

### 2.     **Medical Evidence**[2]

On August 1, 2012, and August 22, 2012, Plaintiff met with Bruce I. Prager, M.D., at the Orthopedic Center of Arlington.  (R. at 318-22.)  At her initial appointment, Plaintiff complained of right wrist pain, and reported that her wrist had been doing well until about two months before.

---

[2] Because only evidence of Plaintiff's physical impairments are at issue, medical evidence regarding her mental impairments is noted only when it includes information relevant to the physical impairments at issue.

(R. at 318.)  Her symptoms included numbness, tingling, locking of the right elbow, and off/on pain, but no joint swelling.  (*Id*.)  Her condition was aggravated by lifting, and her symptoms were relieved by medication.  (*Id*.)  A wrist examination was positive for Phalen's sign[3] and Tinel's sign.[4] (*Id*.)  Dr. Prager determined that Plaintiff had lateral epicondylitis and carpal tunnel syndrome.  (R. at 319.)  At her second appointment, Plaintiff presented with complaints of right elbow pain that affected her elbow and wrist.  (R. at 321.)  She stated that an injection in her right elbow had helped, but she still had numbness and tingling in her hand and arm, and reported that pain radiated down her arm.  (*Id*.)  Her condition was aggravated by lying on her right side, and her symptoms were relieved by medication.  (*Id*.)  Phalen's sign, Tinel's sign, and Durkan's test[5] were all positive.  (*Id*.)

Plaintiff received treatment at Mansfield Urgent Care several times between September 20, 2012, and July 18, 2013.  (R. at 236-41, 248-57.)  In September, she had a follow-up for vertigo and reported dizziness and nausea.  (R. at 256.)  She was taking Antivert for treatment, but her vertigo was better even though she had missed some doses.  (*Id*.)  In November, Plaintiff complained of dizzy spells and a headache.  (R. at 252-53.)  She had no complaints of pain, stiffness, or swelling. (R. at 253.)  In January, Plaintiff presented with stiffness in her neck, discomfort, and neck pain that shot down to her back, which she had for one week.  (R. at 248-49.)  She had no back pain, and no history of fracture or injury.  (*Id*.)  In April, Plaintiff complained of vertigo during the previous

---

[3] "Phalen's sign is defined as an "'appearance of numbness or paresthesias within 30 to 60 seconds during the Phalen test, a positive sign for carpal tunnel syndrome.'" *Gomez v. Colvin*, No. EP-14-CV-293-ATB, 2015 WL 4068499, at *4 n.10 (W.D. Tex. July 2, 2015) (quoting Dorland's Illustrated Medical Dictionary, 1714 (32d ed. 2012)).

[4] "Tinel's sign is defined as 'a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.'" *Gomez*, 2015 WL 4068499, at *4 n.9 (quoting Dorland's Illustrated Medical Dictionary, 1716 (32d ed. 2012)).

[5] Durkan's test is a procedure used to diagnose patients with carpal tunnel syndrome.  *See* Carpal-Tunnel.net, https://www.carpal-tunnel.net/diagnosing/provocative (last visited Sept. 6, 2018).

3

week, which was worse in the 3 days prior to her visit.  (R. at 239-40.)  She had dizziness and nausea

and was under a lot of stress.  (R. at 240.)  She had no complaints of pain, stiffness, or swelling.

(*Id*.)  It was noted that her vertigo was similar to previous occurrences with stress, occurred with

rapid head movement and rolling in bed, and that Antivert had helped in the past.  (*Id*.)  In July, she

complained of lower back pain, which she had experienced all day.  (R. at 236-37.)  She had no neck

pain or swelling and no history of fracture or injury.  (*Id*.)  Her range of motion was normal.  (R. at

238.)  Her back pain was on her left side; her back felt very tight, and she had pain with any rotation,

flexion, or extension.  (*Id*.)

On January 11, 2013, an x-ray of Plaintiff's cervical spine showed mild reversed cervical

lordosis centered at C4-5, and subtle spondylosis.  (R. at 277.)

On January 24, 2013, Jonathan B. Bard, M.D., performed an MRI on Plaintiff's cervical

spine.  (R. at 274-75.)  Dr. Bard noted a history of neck pain.  (R. at 274.)  He found that Plaintiff

had moderate spondylosis at C5-6 with bilateral paracentral osteophytes and protrusions at 3mm that

were greater on the right than the left.  (R. at 274-75.)  She also had moderate neuroforaminal

narrowing but no canal stenosis.  (R. at 275.)  There was a 3mm right paracentral protrusion at C4-5

with osteophytic ridging and right neural foraminal narrowing without cord compression, a 2mm

protrusion at C3-4 without cord compression, and a 3mm right paracentral protrusion at C6-7.  (*Id*.)

Dr. Bard noted that she had multilevel mild facet disease.  (*Id*.)

Plaintiff saw Dr. Prager again from October 29, 2013, to May 28, 2014.  (R. at 323-36.)  In

October, Plaintiff presented with pain in her right hand and left shoulder.  (R. at 323.)  The pain in

her right hand was worse, and she had numbness, tingling, and burning sensations.  (*Id*.)  The pain

radiated to her elbow and shoulder, and she rated the pain as a 10 on the pain scale.  (*Id*.)  Her

4

condition was aggravated by crafting and relieved by medication. (*Id.*) Phalenn's sign, Tinel's sign, and Durkan's test were positive. (R. at 324.) Her left shoulder pain affected her when sleeping at night and picking up her granddaughter, and her symptoms included pain, joint swelling, and limited and painful range of motion, but no numbness or tingling sensations. (*Id.*) She rated her left shoulder pain at an 8 on the pain scale. (*Id.*) A back and spine examination showed no cervical lordosis, asymmetry, or abnormal curvature on her cervical spine, and no spinous process tenderness. (R. at 324.) In November, Plaintiff complained of left shoulder pain and right wrist pain. (R. at 326.) The pain in her left shoulder included symptoms of numbness and tingling, but no joint swelling or stiffness. (*Id.*) Her left shoulder pain was non-radiating, and she rated it as a 7 on the pain scale. (*Id.*) Her symptoms were relieved with medication. (*Id.*) Symptoms in her wrist included numbness, tingling, and weakness, and she stated that no medication gave her relief. (*Id.*) Her wrist pain was between a 7 and 8 on the pain scale. (*Id.*) Dr. Prager recommended carpal tunnel release surgery after her EMG showed that her symptoms had exacerbated. (R. at 327.) Later in November, Plaintiff reported that her right wrist was "doing good," and she denied having any pain or associated symptoms following her wrist surgery. (R. at 330.) Tinel's sign and Phalen's's sign were negative, she was able to flex and extend her fingers, and Dr. Prager noted that Plaintiff was "doing great." (R. at 331.) In May, Plaintiff presented with complaints of right elbow pain. (R. at 332.) She stated that her elbow was not getting better, and she thought she had nerve damage. (*Id.*) She had burning pain mostly in the morning, as well as numbness, tingling, swelling, and popping. (*Id.*) The pain radiated to her right hand and she rated it as a 4 on the pain scale. (*Id.*) This condition was aggravated by putting on makeup, and she had not tried any treatment for her condition. (*Id.*) She had no limitation on flexion, extension, pronation, or supination, no tenderness

on palpation, and Tinel's sign was positive. (R. at 333.) Dr. Prager also noted that x-rays of her cervical spine showed degenerative disc disease. (R. at 334.) Also in May, Plaintiff presented with back pain that affected her cervical spine. (R. at 335.) Her neck was "doing ok," but she was still having numbness, and still had burning pain in her arms. (*Id.*) Her pain was non-radiating, and she rated it as a 6 on the pain scale. (*Id.*) A back examination showed no cervical lordosis, restricted range of motion, and tenderness in her paravertebral muscles. (R. at 336.) Dr. Prager noted that an MRI showed disc bulging at C3-C4, C4-C5, C5-C6, and C6-C7, central canal stenosis at C3-4, and a disc protrusion at C4-5. (*Id.*)

On November 4, 2013, Plaintiff saw James M. Barry, M.D., at Kane Hall Berry Neurology with symptoms of carpal tunnel syndrome following a carpal tunnel release procedure. (R. at 305.) She stated that her symptoms, which were moderate in severity, began about 3 years ago. (*Id.*) Her symptoms had worsened, and the problems occurred constantly. (*Id.*) Her symptoms included decreased grip strength, nocturnal paresthesia, and pain in her fingers and hand. (*Id.*) The pain radiated to her forearm and elbow, and her symptoms were aggravated by repetitive work, hand intensive activity, and crafting/applying makeup. (*Id.*) Other associated symptoms included difficulty sleeping, wrist tenderness, weakness, and nighttime awakening. (*Id.*) She had been using wrist splints, but the pain was becoming unbearable. (*Id.*) Dr. Barry noted that Plaintiff had four prior foot surgeries and a prior carpal tunnel release. (*Id.*) He also noted that there had been interval improvement in the appearance of Plaintiff's carpal tunnel syndrome. (R. at 309.)

Plaintiff saw Benjamin C. Dagley, D.O., at Cedar Hill Pain and Rehab (Cedar Hill) several times from June 10, 2014, to October 29, 2014, upon referral from Dr. Prager. (R. at 338-47, 354-58.) Her chief complaint on June 10, 2014, was neck pain; she had been hurting for many years.

6

(*Id.*)  She remembered suffering an injury when she was a child, which she thought contributed to her pain.  (*Id.*)  Dr. Dagley noted that Plaintiff had symptoms of carpal tunnel syndrome, and that she previously had two carpal tunnel surgeries, but her symptoms had persisted.  (*Id.*)  He also noted that an MRI showed disc bulges at multiple levels with no nerve root impingement, moderate foraminal stenosis at C5-6 on the right, and mild central stenosis.  (*Id.*)  Physical therapy had not helped.  (*Id.*)  She complained of constant, burning neck pain that radiated to her right hand, and reported that the pain was worse with gripping and lifting her arms up to 90 degrees of shoulder abduction.  (*Id.*)  Lying on her side made her pain worse, Lodine helped, and she also occasionally took Aleve.  (*Id.*)  Her pain was at an 8 out of 10.  (*Id.*)  She also had numbness, tingling, and weakness in her right arm and hand, and admitted that her quality of life and function decreased because of her pain.  (*Id.*)  Her range of motion in her neck, shoulders, elbows, wrists, and hands were all normal, but Tinel's sign was positive in her right elbow, and Phalen's test was positive in her right hand and wrist.  (R. at 339.)  Dr. Dagley found that she had signs of cervical radiculopathy and stenosis, and recommended a cervical epidural steroid injection with catheter to C5-6 on the right.  (R. at 340.)

On July 16, 2014, and August 6, 2014, Plaintiff received epidural steroid injections.  (R. at 341, 343.)  She was anxious about the procedures and had some difficulty lying in a prone position.  (*Id.*)  The procedures were successful, and Plaintiff was instructed to follow-up in 1-2 weeks.  (*Id.*)

On August 18, 2014, Plaintiff presented to Dr. Dagley with neck pain.  (R. at 345.)  She complained of intermittent, aching upper back pain, which did not radiate, and she stated that the pain was better with heat, ice, and pain cream.  (*Id.*)  Sitting made the pain worse, and it was also worse at night.  (*Id.*)  Her pain was at a 6 out of 10.  (*Id.*)  Her range of motion in her neck,

shoulders, elbows, wrists, and hands were all normal, but Tinel's sign was positive in her right elbow, and Phalen's test was positive in her right hand and wrist.  (R. at 345-46.)  Plaintiff was provided trigger point injections, and Dr. Dagley explained that she would likely need more than one set of trigger point injections to eliminate her pain.  (R. at 347.)

Plaintiff underwent another epidural steroid injection with Dr. Dagley on October 22, 2014, and that procedure was successful.  (R. at 354.)

She saw Dr. Dagley again on October 29, 2014, complaining of neck pain.  (R. at 356.)  She had intermittent, aching upper back pain, which did not radiate to her shoulder, and she had numbness in her right hand.  (*Id*.)  The pain was better with pain and ice, but worse with sitting, and worse at night.  (*Id*.)  Her pain was at a 6 out of 10.  (*Id*.)  Her range of motion in her neck, shoulders, elbows, wrists, and hands was normal, but Tinel's sign was positive in her right elbow, and Phalen's test was positive in her right hand and wrist.  (R. at 357.)

On September 16, 2014, and October 7, 2014, Plaintiff saw Jamie Spicer, M.D., at Cedar Hill.  (R. at 348-53.)  At both appointments, she complained of intermittent, aching upper back pain, which radiated to her shoulder, and numbness in her right hand.  (R. at 348, 351.)  Her pain was better with heat and ice, but worse with sitting, and at night.  (*Id*.)  Her range of motion in her neck, shoulders, elbows, wrists, and hands was normal, but Tinel's sign was positive in her right elbow, and Phalen's test was positive in her right hand and wrist.  (R. at 349, 352.)  In September, she stated that her pain was getting better, and her pain level was at a 6.  (R. at 348.)  Dr. Spicer noted that she previously had trigger point injections that did help, and that she had been through physical therapy, which did not help.  (R. at 350.)  In October, she stated that her pain was getting worse, and her pain level was at a 10.  (R. at 351.)  Dr. Spicer noted that Plaintiff's MRI showed disc bulges at multiple

levels with no nerve root impingement, moderate forminal stenosis at C5-6 on the right, and mild central canal stenosis. (R. at 353.) He also noted that physical therapy did not help, and recommended maximizing medication management. (*Id*.)

On November 6, 2014, Plaintiff was seen by Michael F. Duffy, M.D., at the Texas Back Institute (TBI). (R. at 495.) She had neck and right arm pain and numbness that had been progressive for years. (*Id*.) The pain extended through her shoulder into her thumb and index finger on her right hand. (*Id*.) Dr. Duffy noted that she recently underwent three epidural steroid injections at C5-C6 that provided only short term relief, and she had an EMG study that suggested radiculopathy at the C4-C5 level. (*Id*.) She rated her neck and arm pain at an 8 out of 10, and stated that her pain was better lying down and with massage, but worse with sitting, standing, walking, or physical activity. (*Id*.) Plaintiff wanted her life back; she wanted to have no pain in her arm and hand, and to be able to write, do her hair and makeup, and cook without pain. (*Id*.) Her pain was worse at night, caused her to wake up, and was affected by coughing. (*Id*.) Her pain was also worse with heat and cold, and during rising from a chair. (*Id*.) Her legs would hurt or get tired if she walked too far, she thought she could walk about 1-3 blocks, and she did not think she could get relief from resting her legs or bending forward. (*Id*.) Plaintiff indicated that she was physically unable to work due to back and neck problems, and her problems affected her abilities to lift, walk for a long time, and type. (R. at 497.) A physical exam showed that her cervical spine alignment was neutral, and her cervical range of motion was painful and restricted. (R. at 498.) Plaintiff was found to have progressive neck and right arm pain with mild weakness over the prior year or more, and it was noted that conservative treatment measures had failed. (R. at 500.) It was recommended that Plaintiff undergo an artificial disc replacement at C4-C5 and an anterior cervical discectomy

and fusion at C5-C6.  (*Id*.)

On December 9, 2014, Plaintiff was again seen by Dr. Duffy.  (R. at 472-79.)  She complained of chronic neck and arm pain, and Dr. Duffy noted that she had that pain despite conservative treatment measures, including physical therapy, medications, and injections.  (R. at 472.)  Her MRI showed cervical spondylosis at C4, C5, and C5-C6, and she underwent an anterior cervical discectomy and fusion procedure, which she tolerated well.  (R. at 474, 477-78.)  When examined later in the evening, her pain was at a 7 out of 10, and she also had some nausea after surgery.  (*Id*.)

On December 19, 2014, Plaintiff went to the TBI and reported that she was doing extremely well following her discectomy and fusion procedure.  (R. at 493.)  Her right arm pain and numbness had significantly improved, and she stated that the numbness had resolved completely.  (*Id*.)  She was "extremely pleased" with the outcome.  (R. at 493-94.)

Plaintiff met with Dr. Dagley again on January 7, 2015, and January 12, 2015.  (R. at 526-32.)  She complained of intermittent numbness and tingling in her left hand that was worse at night and when gripping.  (R. at 526, 530.)  Her range of motion in her neck, shoulders, elbows, wrists, and hands was normal, but Tinel's sign was positive in her left elbow, and both Tinel's sign and Phalen's test were positive in her left hand and wrist.  (R. at 527, 531.)  Her pain level at the first appointment was at a 5, and it was at a 2 at her second appointment.  (R. at 526, 530.)

On January 21, 2015, Plaintiff returned to the TBI for a follow-up.  (R. at 510.)  She was doing extremely well, and had resolution of the pain in her upper arm.  (*Id*.)  The weakness in her right C6 distribution had improved as well.  (R. at 511.)  She had continued left paresthesia related to cubital tunnel syndrome that was found on a recent EMG study, and she felt that it was

10

exacerbated by sleeping on her side.  (R. at 510.)  She was very pleased with her progress and stated that her arm pain and weakness had significantly improved.  (*Id.*)  She also had some swallowing difficulty over the previous 6 weeks, and although she could swallow foods and liquids, it required some effort at times.  (R. at 510-11.)  She was scheduled to begin physical therapy for her neck and upper extremities.  (R. at 511.)

On January 26, 2015, Jeanine Kwun, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (R. at 52-53.)  She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than shown for lift and carry, including operation of hand and foot controls; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl; with no manipulative, visual, communicative, or environmental limitations.  (*Id.*)  Dr. Kwun referenced Plaintiff's medical records showing that Plaintiff had bulging discs and degenerative disc disease, but also that she did "extremely well" after her operations, and her right arm pain and numbness significantly improved/completely resolved. (R. at 53.)  She also referenced Plaintiff's activities of daily living.  (*Id.*)  She noted that Plaintiff's alleged limitations were partially supported by the evidence in the file, but were not expected to last for 12 months.  (*Id.*)

On January 29, 2015, and March 2, 2015, Plaintiff went to Cross Timbers ENT for difficulty swallowing.  (R. at 546, 552.)  She initially reported that the onset had been gradual and occurring in a persistent pattern for months, but her symptoms were worse since her neck surgery on

December 9, 2014, and she had difficulty eating and swallowing foods. (R. at 546.) At the second appointment, she described her symptoms as being in her neck and throat, and with both liquids and solids. (R. at 552.) She felt like her throat was tightening, and she had difficulty breathing when she was lying in bed. (*Id*.)

On April 6, 2015, Roberta Herman, M.D., an SAMC, also completed a physical RFC assessment based on the medical evidence. (R. at 64-65.) Her findings were identical to those of Dr. Kwun. (*Id*.)

Plaintiff met with Dr. Duffy again on October 12, 2015, and stated that she continued to have significant tingling and numbness in her index and thumb bilaterally. (R. at 583.) Dr. Duffy noted that Plaintiff had two carpal tunnel surgeries on the right, no pain radiating from her neck, and no weakness. (*Id*.) He also noted that she continued to have right shoulder pain. (*Id*.) A physical exam showed mild weakness in her right C6 distribution, normal sensation throughout her bilateral upper extremities, moderate pain to palpation over her right median nerve with positive Phalen's test, mildly positive Phalen's test on the left, and mild pain with range of motion on her right shoulder with positive impingement signs. (R. at 584.) Dr. Duffy recommended that Plaintiff go forward with an injection in her right shoulder and physical therapy for impingement syndrome, and that she take Celebrex nightly and use "cockup wrist splints" bilaterally. (*Id*.) He did not believe her carpal tunnel symptoms were coming from her neck. (*Id*.)

Plaintiff saw Dr. Dagley again on October 26, 2015, and November 17, 2015. (R. at 569-74.) She complained of constant numbness and tingling in both hands that was worse at night and when gripping. (R. at 569, 572.) Tramadol, Celebrex, and wearing wrist splints at night helped some. (*Id*.) Her range of motion in her neck, shoulders, elbows, wrists, and hands were all normal, but

Tinel's sign was positive in her right and left elbows and right hand and wrist, and Phalen's test and Tinel's sign were positive in her left hand and wrist. (R. at 570, 573.) In October, her pain was at a level 8 on the pain scale, and it was at a level 7 in December. (R. at 569, 572.)

Plaintiff saw Dr. Duffy again on December 7, 2015. (R. at 566.) He noted that she was a year out from cervical surgery and was doing quite well. (*Id.*) Her neck and radiating arm symptoms had resolved, but she was still having compressive neuropathy in her hands bilaterally. (*Id.*) She had a positive Tinel's sign and Phalen's test on her right wrist, and positive Tinel's sign on her left elbow. (R. at 567.) He recommended surgical intervention for her cubital and carpal tunnel syndrome. (*Id.*)

On December 8, 2015, Plaintiff met with Richard J. Burkett, M.D., to consider treatment of her right carpal tunnel syndrome and left cubital tunnel syndrome. (R. at 560-61.) Dr. Burkett noted that she had a very complicated history, including cervical neck procedures, two previous right carpal tunnel releases, and multiple injections for her back issues. (R. at 560.) Plaintiff stated that she had "a great deal of pain and numbness in [her] hands[,] but also describe[d] symptoms of discomfort" that seemed to be more akin to neuropathies related to nerve degeneration or nerve changes, or more proximal cervical radiculopathy. (*Id.*) She also stated that she had relief from her prior carpal tunnel surgeries, but her pain returned after some time. (*Id.*) She described pain, numbness, and paresthesias in her left hand, and stated that her discomfort in her left hand was much different than in her right hand. (*Id.*) She had a very positive Tinel's sign in her left elbow, and very positive Phalen's test on the right that was different in character and severity from the left. (*Id.*) Dr. Burkett noted that splints helped the carpal tunnel syndrome in her right hand. (*Id.*) He thought it safe to consider proceeding with a right carpal tunnel and left cubital tunnel release. (R. at 561.)

13

Plaintiff underwent a right carpal tunnel release, left cubital tunnel release, nerve transposition, and neurolysis of the median nerve in her right wrist on December 14, 2015.  (R. at 557-59.)

On March 11, 2016, Plaintiff saw Dr. Duffy for a follow-up.  (R. at 562.)  She reported that her neck pain was manageable with medication.  (*Id*.)  A physical exam found no focal deficits in her upper extremities, but there was pain with range of motion in her cervical spine.  (R. at 563.)  Dr. Duffy noted that the right carpal tunnel procedure and left cubital tunnel procedure helped with Plaintiff's symptoms.  (R. at 563-64.)

### 3.    Hearing Testimony

On March 24, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 30-46.)  Plaintiff was represented by an attorney.  (R. at 31.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 51 years old, had a high school education, and was last employed as a department manager in April of 2013.  (R. at 32-33.)  She worked as a department manager for 8 years.  (R. at 43.)  She stopped working because she was dismissed for safety violations.  (R. at 33.)  She was not working at the time of the hearing, and stated that she had also previously worked as a teacher's aide.  (*Id*.)

Plaintiff stated that she did not think that she could work as a teacher's aide anymore because of the amount of sitting, walking, getting up, moving around with kids, and going to and from the cafeteria and outside.  (*Id*.)  She could not sit for long periods of time because she had problems with her back and sciatic nerve, and her feet and legs would start tingling.  (*Id*. at 33-35.)  She received several epidural steroid injections in her back from Dr. Bagley to treat her lower back problems.  (R. at 33-34.)  She also received an injection in a nerve in her neck, but "that did[ not] do any good"

and led to her neck surgery. (R. at 34.) She was still having issues following neck surgery. (*Id.*) She had used a cane in the past and did not wear a back brace. (R. at 35.) She had experienced muscle spasms in her back before, and had taken medication, but she was no longer taking the medication and was still having spasms. (*Id.*) She was taking Tramadol, which was prescribed for pain, and it did help. (*Id.*) She also went to the gym to do "water therapy," which helped, but she did not lift any weights. (*Id.*) The pain in her back seemed "to travel down into [her] legs," and she thought she would "get like a restless leg syndrome" after lying down for long periods of time. (R. at 35-36.)

Plaintiff drove to the hearing that morning. (R. at 36.) To keep herself busy, she would clean, and maybe do yard work if she could, but she was very limited, and was finding herself more limited than before. (*Id.*) Her appetite was not how it used to be, and she had lost 35 pounds. (*Id.*) She did not sleep well at night because she would constantly turn to try to get comfortable and would "experience the restless leg syndrome." (*Id.*) The restlessness in her legs sometimes affected her ability to walk. (R. at 37.)

Plaintiff had problems eating and swallowing such that her medications would get stuck in her throat, and she would have to drink or "eat something to make it go down." (*Id.*) Her trouble swallowing began in June of 2014, after getting sick with bronchitis. (*Id.*) She also had trouble swallowing food, and it would get lodged in her throat at times. (R. at 38.)

Plaintiff stated that her neck surgery was a fusion, and she was still having lingering effects from it. (R. at 38.) She went to physical therapy, which helped, but she had problems extending her neck "all the way from the left to the right," and did not have full range of motion like before. (*Id.*) She also did not read anymore because her neck felt strained when she would look down for long

periods of time, and she would get headaches and nausea.  (*Id*.)  Whether she was sitting or standing

while looking at something, she felt the "tension of moving."  (*Id*.)  She could not sit and rock her

neck or stretch it like she used to, and the tension and stress from "leaning over or looking into

something" caused her to constantly move around, which was "very uncomfortable."  (R. at 38-39.)

She had discomfort and pain in her neck on a daily basis.  (R. at 39.)

       Plaintiff had three surgeries on her right hand for carpal tunnel, but none her left hand.  (*Id*.)

She also had surgery in December of 2015, for a pinched nerve in her left elbow, and the doctor

"relocated that nerve."  (R. at 39-40.)  She had numbing and tingling, which was not has bad since

her carpal tunnel surgery on her right hand, but she also felt tingling and burning when she would

lie down or sit back a certain way.  (R. at 40.)  She did not have pain in her wrists at the hearing

because she took her medication that morning, and it helped.  (*Id*.)  Plaintiff could grip things, but

she did not have the strength in her hands that she had before, and she had problems opening jars

and bottles, buttoning shirts, gripping and lifting heavy things, and picking up and putting down her

dog.  (R. at 40-41.)  She still had tingling and numbing in her left elbow, and the doctor told her it

could take up to a year to get back to normal following the surgery because the nerve had been

relocated.  (R. at 41.)  She was taking Tramadol, Lyrica, Celebrex, and Meclizine.  (*Id*.)  Plaintiff

had also suffered from vertigo for about four years and took Meclizine daily to treat it.  (*Id*.)

       When she sat for long periods of time, she would get tension in her back that felt like burning

and tingling "going down the right side of [her] buttocks down to [her] legs" because of her sciatic

nerve.  (R. at 42.)  She thought she could sit for about 30 minutes to 1 hour before her pain started.

(*Id*.)  She also could not stand for long periods of time because her restless leg syndrome would

make her feel uncomfortable, and she would constantly move "to make it loose so that way it [could]

be calm." (*Id*.)  She thought she could stand about 30 minutes to 1 hour before that feeling started. (*Id*.)  She further stated that she could not walk for long periods of time because she would lose her breath, and the pain in her legs from her sciatic nerve would make her stop.  (R. at 42-43.)

Plaintiff also had foot surgery in the past.  (R. at 43.)  She had plantar fasciitis on both feet, and stress fractures on "both feet around the big toe to the middle of [her] foot.  (*Id*.)  She had four foot surgeries in 2010 and 2011.  (*Id*.)  Since her surgeries, she had not been able to wear shoes because they would cut off her circulation, and she mainly wore sandals daily.  (*Id*.)  She could not stand on her feet very long because they would begin to hurt.  (R. at 43-44.)

### b.    *VE's testimony*

The ALJ asked the VE to define the exertional demands and the skill requirements of a hardware store department manager and a teacher's aide.  (R. at 44.)  The VE responded that the department manager was medium, with an SVP of 7, and the teacher's aide was light, with an SVP of 3.  (*Id*.)  The ALJ then asked the VE to consider a hypothetical individual of the same age, education, and past relevant work experience as Plaintiff, who had an RFC "somewhere between sedentary and light work with no repetitive handling or fingering." (*Id*.)  The ALJ asked if the hypothetical individual could perform the jobs of department manager or teacher's aide.  (*Id*.)  The VE responded that the individual could perform work as a teacher's aide.  (R. at 45.)

Plaintiff's attorney asked the VE to describe the teacher's aide job.  (*Id*.)  The VE responded that a teacher's aide performs "a combination of duties in classrooms to assist teachers such as taking attendance, grading papers, supervising students, [and] distributing materials." (*Id*.)  Plaintiff's attorney then asked if a person would be able to maintain a job as a teacher's aide if they were absent twice a month.  (*Id*.)  The VE responded that the person would not be able to maintain

a job.  (*Id*.)  She then asked about the allowance for breaks.  (*Id*.)  The VE responded that most employers allow breaks about every 2 hours, for about 15 minutes at a time, and a one hour lunch break.  (*Id*.)

## C.    <u>ALJ's Findings</u>

The ALJ issued his decision denying benefits on May 17, 2016.  (R. at 7-21.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 5, 2013, the alleged onset date.  (R. at 12.)  At step two, the ALJ found that she had the following severe impairments: cervical spine disorder and bilateral carpal tunnel syndrome.  (*Id*.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (R. at 14.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, but was limited to frequent fingering and handling bilaterally.  (*Id*.)  At step four, the ALJ determined that Plaintiff could perform her past relevant work as a teacher's aid because it did not require the performance of work-related activities precluded by her assigned RFC.  (R. at 17.)  Because he found that she could return to past relevant work, the ALJ did not reach step 5.  (*See* R. at 17-18.)  Accordingly, he determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from April 5, 2013, through May 17, 2016.  (R. at 18.)

## II.  ANALYSIS

## A.    <u>Legal Standards</u>

### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id.* Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

**2.       Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

19

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1. The decision must be remanded because the residual functional capacity assessment ("RFC") provided to the vocational expert ("VE") was not used in the decision.[6]

2. The decision must be remanded because the RFC assessment lacks substantial evidence.

3. The decision must be remanded because a function by function RFC assessment was not included in the decision.

4. The decision must be remanded because of the failure to address the Plaintiff's composite occupation.

(doc. 16 at 2.)

### A.    RFC Assessment[7]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (doc. 15-20.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others

---

[6] Although listed first, Plaintiff's issue regarding the ALJ's hypothetical RFC provided to the VE implicates step four, which comes after the RFC assessment in the sequential evaluation process. Accordingly, Plaintiff's second and third issues regarding the RFC assessment are considered first.

[7] Because Plaintiff's second and third issues implicate the ALJ's RFC assessment, they will be considered together.

of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id*. Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and

22

a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform light work, but limited her to frequent fingering and handling bilaterally.  (R. at 14.)

### 1.    Plaintiff's Manipulative Limitations[8]

Plaintiff argues that the ALJ's finding that she could "frequently handle and finger with her bilateral upper extremities" was not supported by substantial evidence.  (doc. 16 at 18.)  She claims that a review of the medical evidence "plainly and clearly proves that she did not have the ability to frequently or repetitively use her bilateral upper extremities for fingering and handling."  (*Id*. at 17.)

As noted, a reviewing court must defer to the ALJ's decision when substantial evidence supports it.  *Leggett*, 67 F.3d at 564.  In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Id*. (citing *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir. 1984)); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993)).  Likewise, the substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision.  *Singletary v. Bowen*, 798 F.2d 818, 822–23 (5th Cir. 1986).  An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions

---

[8] Manipulative limitations include reaching, "handling, fingering, and feeling."  *Bennet v. Colvin*, No. 6:14–CV–0069–BL, 2016 WL 873850, at *3 n.4 (N.D. Tex. Feb. 17, 2016).

regarding the evidence. *Armstrong*, 814 F. Supp. at 1373.

There is no general duty to explain or provide rational and logical reasons for a decision, however. *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases); *see Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *21 (N.D. Tex. Mar. 22, 2017) (citing *Escalante*, 2015 WL 1443000, at *14). The regulations require only that an ALJ consider and evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record. *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

Here, in determining Plaintiff's manipulative limitations, the ALJ found that although Plaintiff's treatment records showed that she consistently reported numbness and tingling in her hands, she also had improvement "with treatment including the use of medication, nightly use of wrist braces, [and] carpal tunnel release surgeries." (R. at 16.) He considered Plaintiff's 2011 carpal tunnel release surgery, and noted that although her symptoms exacerbated in 2013, and another carpal tunnel release surgery was recommended by Dr. Prager, EMG testing revealed internal improvement in comparison to 2011. (R. at 16.) He noted that Plaintiff continued to report numbness and tingling in her hands in 2014 and 2015, and underwent carpal tunnel release and cubital tunnel release surgeries in December 2015. (R. at 16-17; *see* R. at 557-59.) He considered that following the surgery, the results of a physical examination were unremarkable, there were no focal deficits in her upper extremities, and Plaintiff reported that her symptoms had decreased and the surgery helped her arm pain. (R. at 17; *see* R. at 562-64.) He concluded that although the record showed Plaintiff had some physical limitations, she had "minimal loss of strength and no evidence

24

of loss of gross or fine motor skills," and he specifically accounted for her manipulative limitations by limiting her to only frequently handling and fingering.  (R. at 14, 17.)

Because the ALJ relied on medical evidence in the record in making his RFC determination, his assessment regarding Plaintiff's manipulative limitations was supported by substantial evidence.  *See Greenspan*, 38 F.3d at 236 (noting that in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment); *see also Winston v. Berryhill*, 3:16-CV-419-BH, 2017 WL 1196861, at *10–11 (N.D. Tex. Mar. 31, 2017).

### 2.    Function-by-Function Analysis

Plaintiff argues that remand is required because the RFC assessment did not include a function-by-function analysis.  (doc. 16 at 19.)  She asserts that the ALJ failed to discuss any of the seven strength demands and violated Social Security Ruling 96-8p by stating the RFC in terms of the exertional levels of work.  (*Id.*)

In making an RFC determination, the ALJ must perform a function-by-function assessment of the claimant's capacity to perform sustained work-related physical and mental activities "based upon all of the relevant evidence" and taking into account "both exertional and nonexertional factors."  *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (citing SSR 96-8P, 1996 WL 374184, at *3–6 (S.S.A. July 2, 1996)).  Exertional factors involve seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.  SSR 96-8P, 1996 WL 374184, at *5.  Non-exertional factors include "all work-related limitations that do not depend on an individual's physical strength," such as postural and manipulative limitations.  *Id*. at *6.  "[W]ithout the initial function-by-function assessment of the individual's physical and mental capacities, it may not be

25

possible to determine whether the individual is able to do past relevant work" at step four or perform other "types of work" at step five. *Id*. at *3–4; *accord Myers*, 238 F.3d at 620.

The RFC assessment "considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments." *Id*. at *1. "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id*. Even if the ALJ fails to conduct a function-by-function analysis, he satisfies this requirement if he bases his RFC assessment, at least in part, on a state medical examiner's report containing a function-by-function analysis. *Beck v. Barnhart*, 205 F. App'x 207, 213–14 (5th Cir. 2006) (per curiam); *Onishea v. Barnhart*, 116 F. App'x. 1 (5th Cir. 2004) (per curiam).

Here, as noted, the ALJ determined that Plaintiff had the RFC to perform light work, but limited her to frequent fingering and handling bilaterally. (R. at 14.) Although the ALJ did not conduct a function-by-function analysis of Plaintiff's physical work-related activities in accordance with SSR 96-8p, he based his determination, in part, on the medical reports from the SAMC Drs. Kwun and Herman, which contained function-by-function analyses of the impact of Plaintiff's impairments on her ability to perform various work-related tasks. (R. at 17.) These reports, in conjunction with the testimony and medical evidence of record relied on by the ALJ in making the RFC determination, "satisfy the function-by-function assessment requirement in SSR 96-8p." *McMillian v. Colvin*, No. 4:12–CV–661–A, 2014 WL 61172, at *10 (N.D. Tex. Jan. 6, 2014); *see Beck*, 205 F. App'x at 213–14. Because the ALJ relied in part on SAMC reports containing

function-by-function analyses, his RFC determination is "supported by substantial evidence and satisfies the standards announced in *Myers*" and SSR 96-8p. *Beck*, 205 F. App'x at 213–14; *see Onishea*, 116 F. App'x at 2 (finding that an RFC assessment, based in part on a state examiner's function-by-function analysis of the claimant's exertional limitations, satisfied the legal standard set forth in *Myers* and SSR 96–8p); *see also Chavira v. Astrue*, No. 11–CV–00262, 2012 WL 948743, at *9, 23 (S.D. Tex. Feb. 29, 2012) (finding that the ALJ's finding that the claimant could perform sedentary work satisfied SSR 96–8p where the ALJ evaluated the RFC of an SAMC who determined that the claimant was able to perform light work).

In sum, the ALJ did not err in evaluating Plaintiff's manipulative limitations or in failing to conduct a function-by-function analysis, and his RFC assessment is supported by substantial evidence. *Leggett*, 67 F.3d at 564.

**B.    Defective Hypothetical**

Plaintiff argues that the hypothetical RFC that the ALJ provided to the VE at the hearing differed from the RFC in his decision, and resulted in an "inadequate basis for reliance on the VE's testimony" in determining that Plaintiff could return to her past relevant work as a teacher's aide. (doc. 16 at 15-16.) She contends that because the hypothetical "RFC did not include the ability to perform 'light work,' she is unable to return to the occupation of teacher's aide, which requires the ability to perform unrestricted light exertion" work. (doc. 16 at 15.) She also argues that "the ALJ's hearing hypothetical failed to clearly define the handling and fingering limitation . . . ." (*Id.*)

To establish that work exists for a claimant at steps four and five of the sequential disability determination process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question. *See Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ, and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Id*. at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability," however. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Id*. at 708.

Here, the ALJ presented a hypothetical question to the VE asking whether a hypothetical individual with the same age, education, and past relevant work experience as Plaintiff, who had an RFC "somewhere between sedentary and light work with no repetitive handling or fingering," could perform Plaintiff's past work. (*Id*.) The VE opined that the hypothetical individual could perform Plaintiff's past work as a teacher's aide, which was light exertion work. (R. at 44-45.) As noted, in the RFC determination, the ALJ found that Plaintiff retained the RFC to perform light work, with a limitation for frequent fingering and handling bilaterally. (R. at 14.) The ALJ then relied on the VE's testimony in determining that Plaintiff could return to her past relevant work as a teacher's aide. (R. at 17-18.)

Although the ALJ's hypothetical to the VE provided for an exertional level "somewhere between sedentary and light work," the VE stated that Plaintiff could perform her past work as a teacher's aide, and specifically identified that job as light exertion. (R. at 44-45.) The ALJ ultimately limited Plaintiff only to light work in his RFC determination, and relied on the VE's testimony in determining that Plaintiff could return to her past work as a teacher's aide. (R. at 14,

17-18.)  His finding that Plaintiff could perform light work undermines Plaintiff's argument that she would be unable to return to her past work as a teacher's aide.  (*See* R. at 44.)

The hypothetical to the VE also stated that the individual was limited to "no repetitive fingering and handling bilaterally," but the ALJ's RFC determination limited Plaintiff to "frequent fingering and handling bilaterally."  (R. at 14, 44.)  The Commissioner argues that the ALJ's hypothetical "captured the concrete consequences of Plaintiff's impairments."  (doc. 17 at 9.) "'Frequent' means occurring from one-third to two-thirds of the time," however, and the ALJ's hypothetical for "no repetitive fingering and handling" does not appear to incorporate the limitation in Plaintiff's RFC for frequent fingering and handling.  *See Ferdin v. Colvin*, No. SA-15-CA-29-DAE, 2015 WL 7767980, at *8 (W.D. Tex. July 30, 2015) (defining frequent as set forth by the Social Security Administration).  The Commissioner also asserts that Plaintiff had the opportunity to cross-examine the VE.  (doc. 17 at 8.)  Plaintiff's failure to point out deficiencies in the hypothetical on cross-examination does not "salvage the hypothetical," however, since the ALJ relied on the VE's testimony based on the defective hypothetical in determining that Plaintiff was not disabled because she could perform her past relevant work as a teacher's aid.  *See Boyd*, 239 F.3d at 707.

Accordingly, the ALJ's decision was not supported by substantial evidence because his hypothetical to the VE failed to reasonably incorporate the manipulative limitations recognized by him in his RFC determination, and he relied on the VE's testimony in making his disability determination.  *See Bowling*, 36 F.3d at 436; *see also Singleton v. Colvin*, No. 2:15-CV-0268, 2016 WL 8674675, at *5 (N.D. Tex. Sept. 9, 2016) (determining that the Commissioner's decision was "not supported by substantial evidence because the ALJ relied on the VE's answers to a hypothetical

that failed to incorporate" the plaintiff's limitation for occasional manipulation); *see also Benton ex rel. Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (finding error where the Commissioner acknowledged a discrepancy in the RFC and hypothetical because the RFC was more restrictive than the hypothetical posed to the VE); *Eastham v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-2001-L, 2012 WL 691893, at *8–9 (N.D. Tex. Feb. 17, 2012) (finding that a determination of non-disability based on a hypothetical that left out functional limitations was error).

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show that she was prejudiced by the ALJ's reliance on the VE's testimony that was based on a defective hypothetical. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's reliance on the testimony of the VE, which was based on a defective hypothetical, casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Here, the VE did not testify regarding the manipulative requirements of a teacher's aide, and the ALJ did not inquire about the manipulative requirements of that job.  (R. at 44-45.)  As in *Singleton*, the Court "simply cannot speculate how the VE would have responded if the hypothetical had included the [frequent] manipulative limitation[s] ultimately found by the ALJ as part of [P]laintiff's RFC, nor can this [C]ourt speculate how the ALJ would have ruled if the VE's

testimony was based on a non-defective hypothetical." 2016 WL 8674675, at *5. Accordingly, the ALJ's reliance on the VE's testimony that was based on a defective hypothetical casts doubt as to whether substantial evidence exists to support the ALJ's finding that Plaintiff was not disabled.[9] *See id*. at *5-6; *see also McNair*, 537 F. Supp. 2d at 837.

## IV.    RECOMMENDATION

The Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** to the Commissioner for further proceedings.[10]

**SO RECOMMENDED**, on this 7th day of September, 2018.

_Irma Carillo Ramirez_

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9] Because this error requires remand, and the ALJ's consideration of VE testimony based on a non-defective hypothetical may affect the remaining issue, it is unnecessary to reach that issue.

[10] Plaintiff seeks attorney's fees under the Equal Access to Justice Act (EAJA). (doc. 16 at 22.) Under the EAJA, the Court must award attorney's fees and expenses if (1) the claimant is the "prevailing party"; (2) the Government's position was not "substantially justified"; and (3) there are no special circumstances that make an award unjust. *Murkeldove v. Astrue*, 635 F.3d 784, 790 (5th Cir. 2011) (citing 28 U.S.C. § 2412(d)(1)(A)). To the extent Plaintiff seeks attorney's fees, she may file a post-judgment request under Federal Rule of Civil Procedure 54(d)(2) that also complies with the applicable Local Rules for the Northern District of Texas.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

32